# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN GACHAGO, <br>     Plaintiff | ) <br> ) <br> )   CIVIL ACTION NO. <br> ) <br> )   05-10141-RGS <br> ) <br> ) <br> ) |
| v | |
| BRISTOL MYERS SQUIBB, <br>     Defendant | |

### PLAINTIFF JOHN GACHAGO'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION IN OPPOSITION TO DISMISS

Plaintiff, John Gachago, (hereinafter "Gachago" or "Plaintiff") respectfully submits this Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Amended Complaint against Bristol-Meyers Squibb (hereinafter "BMS" or "Company").

### INTRODUCTION

BMS attempts to assert that since Plaintiff had an admitted legal obligation to AMEX then BMS has no obligation to Gachago (or AMEX). This "hands off" portrayal of BMS is inapposite to BMS' actual role in orchestration of the entire three party contractual procedures. The facts illustrate that BMS controlled the entire relationship from the day BMS drafted the first contract through to Gachago's termination on May 3, 2004 when BMS required Plaintiff to return all Company records, Company property, and to submit a final expense report. Since Gachago had been required to authorize BMS to make unilateral deductions from his paycheck, Gachago was obligated to wait until June 1, 2004 to for his final paycheck that was "paid in full."

BMS set all policy and procedures and monitored every aspect of the expense report reconciliation process and it was only BMS that had ability to determine what charges were for "business purposes." With that exclusive "right" of authorization, there also came an inherent obligation to promptly reimburse Gachago and/or AMEX for the charges deemed appropriate.

Assuming that all allegations are true, Gachago did submit all expense reports on a timely basis and Defendant breached its duty by failing to pay the bill (or alternately, by not refuting the charges on a timely basis). Since BMS refused to acknowledge their responsibility and subsequent negligence, Plaintiff had to make a "federal case" out of $1,219 to achieve substantial justice. See Ourfalian v. Aro Mfg. Co., Inc., 31 Mass.App.Ct. 294, 296 (1991). ("All inferences should be drawn in the plaintiff's favor in the complaint "so as to do substantial justice.")

BMS role in this present case is illustrated when Defendant reiterates in its Motion to Dismiss (Fact section, page four): "He agreed to submit the requested paperwork if the hold on his current card was eliminated. BMS immediately contacted American Express on his behalf and, as a result, the hold on his card was removed." (Cites omitted)  Here BMS is attempting to assert a new contract upon an ex employee who has already been "paid in full" i.e., if Gachago promises to conduct an audit, then BMS will remove "the hold" on his new card. Notably, the card referenced is not Gachago's personal card but rather the Corporate card of his new employer and (albeit miniscule) competitor of BMS, Astra Zeneca. Here BMS' admitted control over the AMEX credit collection procedures is quite impressive.[1]

In the present 12(b)(6) motion, BMS improperly asserts that Gachago must plead with "substantial certainty" or the same degree of heightened specificity as required for an allegation of fraud such as in Doyle v. Hasbro, Inc., 103 F.3d 186, 194-195 (1st Cir 1996). Alternately, Plaintiff's obligation to defeat a 12(b)(6) motion is simply to provide the Defendant with sufficient allegations either directly or by reasonable reference concerning the material elements of its claims to put the Defendant on sufficient notice.

In fact, Plaintiff had access to only two (partial) contracts (Exhibits 1 and 2) and one Company policy/procedure (Exhibit 4) when filing the Amended Complaint. Consequently, and

---

[1] This question is piqued, "if BMS can get "a hold" taken off another business' Corporate card, does that also mean BMS could have influenced "the hold" initially being put on the card?"

dictated by necessity, the Complaint may be somewhat short on facts, however "it is not devoid of factual allegations sufficient to put [Defendant] on notice of ]Plaintiff's] claim thereby permitting them to draft a responsive pleading" and defendant's Motion to Dismiss on Counts I, II, and V should be denied. See American Glue & Resin, Inc. v. Air Products & Chemicals, Inc. 835 F.Supp. 36, __ (D.Mass.1993)

## ARGUMENT

The Supreme Court has stated "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46, 78 S.Ct. at 101-102. All factual allegations must be deemed admitted. Jenkins, 395 U.S. at 421, 89 S.Ct. at 1848. Further, the complaint must be liberally construed in favor of the plaintiffs. Id. See 5 C. Wright & A. Miller, Federal Practice and Procedure § 1357 at 598-99 (1969).

"The pleading rules do not require a claimant to set out in detail the facts upon which he bases his claim." Langadinos v. American Airlines, Inc., 199 F.3d 68, 72 (1st Cir.2000) (internal quotation marks omitted). Rather, all that is required is "'a short and plain statement' of the claim showing that the pleader is entitled to relief." DM Research, Inc. v. College of American Pathologists, 170 F.3d 53, 55 (1st Cir.1999). As long as the facts in the pleading "give[ ] the defendant sufficient notice to file a responsive pleading," a generalized statement of facts is adequate. [FN32] Langadinos v. American Airlines, Inc., 199 F.3d at 72-73; accord Swierkiewicz v. Sorema, 534 U.S. 506, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002) (Rule 8 statement "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" '). Accordingly, it is

not necessary to include evidentiary detail. <u>DM Research, Inc. v. College of American Pathologists,</u> 170 F.3d at 55

## FACTS

Mr. John Gachago was an at-will employee of BMS for four years. ¶1 To maintain his employment, Gachago had to follow the rules and procedures imposed on him by his employer, BMS.¶¶ 3-6, 9-12. 17, 53-54  On July 8, 2002, Gachago was required to sign a joint liability "American Express Corporate Charge Card Program" agreement (hereafter "BMS Credit Agreement") which is attached to the Amended Complaint as Exhibit 1. ¶¶ 6, 51. The Corporate AMEX card had both John Gachago and Bristol-Meyers Squibb imprinted on it ¶ 6 and Gachago was liable to both AMEX and BMS for charges on the card. ¶¶ 8, 9, 12, 18

Similarly Gachago was required to sign "Agreement Between Corporate Cardmember and American Express Travel Related Services Company, Inc." (hereinafter "AMEX Credit Agreement"). ¶11, Am.Compl.Ex. 1and to follow company policy as outlined on the card. ¶¶ 12, 61-63. Additionally, The AMEX agreement states: "All business charges are to be reported to the company for expense report processing in accordance with Company policy." ¶¶12, 61-63  The AMEX agreement goes on to recognize," This Agreement has no effect on such procedures or your right to reimbursement or payment by the Company." Am.Comp.Ex.2

In order to get reimbursed for any charges on the Corporate AMEX card, Gachago had to submit monthly expense reports (hereinafter "E/R"). ¶¶ 12, 17, 52, 53, 73 The Company scrutinized Gachago's submitted E/R and the corresponding AMEX charges on a monthly basis, determined which charges were appropriate, and judged his

performance based on his ability to follow Company procedures. ¶¶3, 13, 10, 21, 36, 37, 52-54, 73, 89

Gachago was given a laptop ¶5 so he could receive his AMEX bills, review them, and electronically submit them to BMS along with his E/R. ¶ 17 No hard copies of either the ER or AMEX bills were maintained by the Plaintiff; these documents are in the possession of Defendant. ¶¶ 23-25 Plaintiff asserts that there was always a "past due" or "outstanding balance" on the AMEX Corporate card. ¶ 19, 29, 64-66

On April 27, 2005, Plaintiff gave BMS four weeks notice that he was going to pursue other opportunities. ¶ 95 In that resignation letter incorporated by reference to the Amended Complaint, Gachago states, "I have chosen to pursue an endeavor that I believe will allow me the opportunity for personal and professional growth in many ways." (See attached Resignation Letter) ¶¶ 22, 95 One week later on May 3, 2005, BMS terminated Gachago's employment. ¶¶ 22,71

As per company policy, Gachago had to adhere to BMS' "close out" procedures to properly conclude his employment with BMS. ¶¶22, 24, 55, 72 The "close out" procedure was a checklist of all final requirements and included the return of all Company records, property (including the computer and all files therein), and submission of the final AMEX statement and corresponding expense report. ¶¶ 22, 23, 55, 72 The final E/R was paid in full. ¶ 23

In addition to the monthly ER verification process, BMS had audit procedures ¶¶ 8, 36, 37, 56 and the authority to withhold any disputed monies/charges from its terminated employees. ¶ 8 Since BMS so adamantly enforced all of its express agreements and procedural requirements, ¶¶ 3- 12, 17, 19, 21-24 Plaintiff relied on this

"implied" contract that company policy would continue to be followed and, as a consequence, his final E/R would be reviewed prior to the final payment of wages. ¶ 17, 19, 21, 24, 25, 39, 40

Consequently once Gachago completed the "close out" procedures and received payment on both his final E/R and pay checks, he reasonably believed that his employment had ended and that his contractual obligation to BMS was satisfied. ¶¶ 22-25, 27-29, 31, 34, 38-40 As stated on Plaintiff's first email to BMS, "I left BMS on May 3rd 2004 and as part or (sic) my checkout process I completed a final expense report. . . The final expense report would have accounted for all my BMS expenses. Consequently there should be zero balance." See Am.Comp. Exhibit 5, page 2[2]

When Gachago realized that the past due balance was not simply another late payment by BMS to AMEX ¶¶18, 19, he attempted to get the liability properly assigned to BMS. ¶¶ 29, 31, 34-35. On or about September 1, when entertaining two physicians on a business dinner, Plaintiff discovered a hold had been placed on the Corporate card of his new employer and he had to pay for the meal with personal monies. ¶ 32

After negotiating, BMS told Gachago that they would take "the hold" off his new card if he would agree to reconcile past E/R. ¶¶33-37 For whatever reason, BMS sent Gachago old, inapplicable files ¶¶ 37, 38 and since Gachago had already fulfilled his obligations to BMS in regard to E/R submission, he attempted but did not submit the requested audited expense report from some undetermined time period and for some undetermined expense dating back sometime in the previous three years. ¶¶ 37-38 Also

---

[2] Please note, this email was sent from Mapleleaf-Rx Team, a subdivision of Gachago's new employer.

when "the hold" was taken off his card, Gachago believed that BMS had taken responsibility for and paid the bill. ¶35

Plaintiff asserted in the Amended Pleading that BMS had a) a monthly E/R review process in place, ¶ 17  b) an audit procedure available, ¶ 33 c) a formal close-out procedure to finalize the termination of the employment relationship, ¶ 24 and 4) the ability to withhold funds from the final pay check.. ¶ 8. As reasoned in an email to BMS, "it seems like we have a discrepancy that needs to be resolved. In my mind this ought to have been evident prior to my resignation from BMS." See Am.Comp. Ex. 5 page 1

It is unknown what BMS did for the four weeks subsequent to May 3, but the Amended Complaint does highlight the significance, to Gachago, of receiving his final paycheck, paid in full, on June 1, 2004. ¶¶ 27, 28, 39, 55-58

On or about November 25, 2004, plaintiff applied to refinance his home and learned that the past due balance had (surreptitiously) been reported onto his personal credit rating. ¶ 42 The tarnished credit report resulted in immediate damages, higher interest rates, and lost opportunity. ¶¶ 43-46

## COMPLAINT I

## BREACH OF CONTRACT

In American Glue & Resin, Inc. v. Air Products & Chemicals, Inc. 835 F.Supp. 36 (D.Mass.1993), the Court emphasized that "Rule 8(a), Fed.R.Civ.P. requires the pleader to set forth 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Under this standard the plaintiff 'need only state a set of facts giving rise to the claim . . . sufficient to place defendant on notice as to the type of claim alleged

and the grounds upon which it rests.'" In American, although the Plaintiff's Complaint[3]

merely alleged the existence of contracts by identifying the subject matter of the contracts

and specified the nature of the breach as simply "spillage of chemicals, the Court denied

the Defendant's 12(b)(6) Motion to Dismiss because the Complaint was "not devoid of

factual allegations sufficient to put Air Products and Union on notice of America's claim

thereby permitting them to draft a responsive pleading." Id. at 39

Gachago's Amended Pleadings are similar to those in American, in its reliance on

factual allegations, for in the present case, not only did BMS draft every contract and

Company procedure that Gachago had to abide by for continued employment, the

Defendant is also in sole possession of all the relevant Corporate documentation. It was

only after Plaintiff filed the Initial pleadings that BMS (and AMEX) provided the

(partial) documents now contained in Exhibits 1, 2, and 3[4]. Nonetheless, in its Motion to

Dismiss, which by its nature is prior to Rule 56 Discovery, Defendant asks Plaintiff to

achieve a Summary Judgment level of proof as outlined in Mass Cash Register, Inc. v.

Comtrex Sys. Corp., 901 F.Supp.404, 415 (D.Mass. 1995)

Although this Motion in Opposition requires only the sufficiency of American,

Plaintiff will address the essential elements of a contract claim as discussed in Mass Cash

Register at 415: "(1) an agreement, express or implied, in writing or oral, (2) for a valid

consideration, (3) performance or its equivalent by the plaintiff and breach by the

defendant, and (4) damage to the plaintiff."

---

[3] Specifically, American's Complaint simply stated that defendants materially breached their contracts with American for the sale, delivery, and storage of chemicals, by causing a spillage of chemicals, as alleged by the DEQE, and in Sandra Pollack litigation. America further alleged that it was "severely damaged."
[4] Considering that Exhibits 1 was the only document provided to Plaintiff between the filing of his original Complaint and the Amended Complaint, it could be inferred that BMS' believes this partial document is the most incriminating piece of evidence in their arsenal. Similarly Exhibits 2 and 3 were not obtained from AMEX until after filing a Motion for Preliminary Injunction.

(1) An agreement, express or implied, in writing or oral

Exhibits 1 and 2 of the Amended Complaint are the only (partial) express contracts available to the Plaintiff that show Gachago's and BMS' joint liability to AMEX. These documents were drafted by BMS (and/or by AMEX), Gachago was required to sign them in order to be issued an AMEX Corporate card. Plaintiff contends these were contracts of adhesion and should be construed strictly against the party who drafted it. See Wright v. Commonwealth, 351 Mass. 666, 673, 223 N.E.2d. 666 (credit card application contract of adhesion); Merrimack Valley Nat. Bank v. Baird, 372 Mass. 721, 723-24, 363 N.E.2d 688 (1977) (Contract principles require ambiguities construed against the party who drafted the contract.)

On point, it would appear that the drafters of the American Express Corporate Charge Card Program (hereinafter "BMS credit agreement" or Am.Com. Ex. 1) intended to make both BMS and Gachago liable to AMEX when in Section I, it states (in part): The Applicant and Bristol-Meyers Squibb (3) agree to be bound by the terms and conditions of this agreement. Similarly, in Section II, the drafters intended for BMS to have control over the authorization and the collection of AMEX charges stating: "The individual applicant will be liable to the company for non-business charges and will pay Company or should applicant not pay Company, applicant agrees that Bristol-Meyers Squibb Company may withhold an amount equal to such charges from applicant's pay check, bonus, and/or severance payment." This contract establishes that 1) Gachago was not solely liable to AMEX and that 2) BMS had the final option: to withhold unauthorized charges from Plaintiff's pay.

Similarly, the drafters of the Agreement Between Corporate Cardmember and
AMEX (See Exhibit 2) understood that there were Corporate policies and procedures that
the employee had to abide by:: "All business Charges are to be reported to the Company
for expense report processing in accordance with Company policy... This agreement has
no effect on such procedures or your right to reimbursement or payment by the
Company."[5]  Plaintiff contends that 1) the drafters understood that there would always
be procedures in place for monitoring the monies and that 2) cardholders liability would
ultimately be determined based on the due care in the completion of those procedures.

To that end, Plaintiff has described the strict monthly administrative procedures
that were followed in regard to electronically processing the AMEX bills and expense
reports directly to BMS and the corresponding uncoordinated payment schedule to
AMEX. On several occasions, BMS and Plaintiff reviewed the account in regard to late
payments to AMEX, budgeted expenditures, and clarified disputed AMEX charges. This
dialogue between the parties satisfies the general principal of contract law that to
"establish the existence of an implied contract a party must establish a meeting of the
minds." See Stanton v. University of Maine System, 2001 ME 96, 773 A.2d 1045, 1050
(Me. 2001)

An express contract is a contract whose terms are stated by the parties; an implied
contract is a contract whose terms are not so stated. The legal effect of the two types of
contracts is exactly identical; the distinction is simply based on the way in which mutual
assent is manifested. Samuel Williston & Richard A. Lord, A Treatise on the Law of
Contracts § 1:5, at 20 (4th ed.1990) ; See also South Buffalo Ry. Co. v. Ahern, 344 U.S.

---

[5] The next line of the Agreement states that "AMEX reserves the right to collect the amount of such
charges directly from you." This independent clause may be why AMEX is not a party to this lawsuit,
nonetheless, this default position by AMEX does not relieve BMS from adherence to Company policy..

367, 73 S. Ct. 340, 97 L. Ed. 395 (1953) ("An agreement of conduct does not differ from an express agreement, except in the manner of which its existence is established").

(2) for a valid consideration

Issuing Corporate credit cards makes it easier for BMS to promote its business and for the employees to maximize their performance bonuses. To that end, the contract between BMS and Gachago (and AMEX) allowed Gachago to use a Corporate credit card without burdening his personal finances and allowed BMS to easily monitor the activity and performance of Gachago in the field. By having a system in place, both parties could rely on the monthly submission of expense reports, the timely review of those submitted charges, and a routine payment system – a contract by conduct. Additionally, as consideration for adhering to Company procedures, Gachago was also able to keep his job and to receive performance bonuses.

(3) performance or its equivalent by the plaintiff

Over his four years of employment, Plaintiff performed his obligation to BMS by following procedures and filing of all the required monthly ER; this is evidenced by the tens of thousands of dollars worth of AMEX charges that were reimbursed by BMS.

Since AMEX expected payment in 30 days, BMS had to maintain an efficient system of internal controls. For its employees but also for bookkeeping purposes, BMS was obligated to review the accounts per its established procedures and to promptly reimburse AMEX and/or Gachago directly.

Over time, Plaintiff came to rely on the "contract by conduct" by which BMS scrutinized every E/R and AMEX charge and reported problems promptly. Thus when BMS terminated Gachago's employment services three weeks early and undertook its

formal "close out" procedure, a step that required Gachago to return of all property and the submission of his final expense report. Plaintiff adhered to these procedures promptly and without question.

Plaintiff adamantly asserts that he submitted all expense reports on a timely basis but even if he did not, Plaintiff did submit to and complete all of Defendant's procedures, which is the "equivalent" of performance. Gachago believed that he had followed all procedures up to and including "close out" and he waited four weeks for BMS to review his accounts before paying his final payment of wages in full and thus dismissing any further procedural or financial obligation between the parties.

"The question here is whether there was mutual assent to the ultimate terms of termination. "Parties do not become contractually bound until they mutually assent to bind themselves to an agreement." Mass Cash Register, Inc. v. Comtrex Sys. Corp., 901 F.Supp.404, 416 (D.Mass. 1995) Once again, although this analysis is beyond the scope of a 12(b)(6) Motion to Dismiss, Gachago certainly appeared to assent to the terms of his contract as he knew them. Similarly, BMS apparently also assented by following all established company policies and delaying four weeks (for some significant reason) before making payment in full to Gachago.

(3) and breach by the defendant,

BMS breached the contract when they failed to pay an overdue balance on the Corporate AMEX card. Plaintiff had performed his end of the bargain by submitting all E/R on a timely basis and BMS either negligently or intentionally breached the contract either by not notifying Gachago of the past due amount prior to terminating him (as was past practice) or by failing to withhold the monies due from his final check (as they had

express authority to do). See <u>South Buffalo Ry. Co. v. Ahern</u> 344 U.S. 367, 73 S.Ct. 340 1953 (appellant's course of conduct over the years estopped it from now asserting a flaw in the bargain)

Defendant cites <u>Doyle v. Hasbro, Inc.,</u> 103 F.3d 186, 194-195 (1st Cir 1996) to allege Plaintiff did not plead with "substantial certainty" however <u>Doyle</u> involves an allegation of fraud and has correspondingly heightened pleading requirements. Once again, Plaintiff cites <u>American Id</u> at 39 where the statement "spillage of chemicals" was sufficient to establish a breach.

Gachago signed an express contract governing the AMEX card and based on established contract by conduct, Plaintiff had every reason to believe that BMS would follow all its procedural policies and avail themselves of every opportunity to review the accounts of a terminated employee. To this end, Gachago had given BMS express authorization to withhold disputed monies/charges from his final pay check. As stated in <u>Guckenberger v. Boston University,</u> 974 F.Supp.106, 150 (D. Mass 1997) "So long as the promise is definite and certain so that the promisor should reasonably foresee that it will induce reliance, and reliance occurs, a party can maintain an action for breach." (Citations omitted)

In addition to failing to withhold the alleged unpaid AMEX charges from Gachago's pay check, BMS had an audit procedure (See Am.Comp.Ex. 3) that Defendant neglected to employ until after Gachago had completed all his obligations to the Company and been paid in full. Defendant claims in FN1 of the Motion to Dismiss that BMS was not obligated to perform an audit. Plaintiff agrees that an audit may have been optional but BMS must assume the risk of not undertaking the procedures available to

them. The record indicates that Plaintiff falls under two triggering categories: 1)
Gachago had been had been suspected of abuse in the past (See ¶ 19, 21), and 2) he was
terminated on May 3, 2005, three weeks earlier than requested. Even without a
discussion of how the separation occurred, Black's Law Dictionary defines "termination
of employment" as the complete severance of an employer-employee relationship" and
Plaintiff qualifies under this definition.

In ¶ 39, of the Amended Complaint, Plaintiff clearly summarizes the breach: if
there were unreconciled charges, then BMS could have called employee Gachago on the
phone, they could have assessed late charges, or they could have put a hold on his BMS
Corporate card. Similarly, after termination of employment, BMS could have "audited"
his accounts and withheld any monies in dispute. By not following their own established
procedures, BMS, through their own negligence, becomes liable for the charges. See
Federal Insurance Company, et al., v. Banco Popular De Puerto Rico et al. , 1983
(evidence of numerous faults with employer's internal control system supported finding
that employer was negligent.)

4) damage to the plaintiff

Due to the Defendant's breach of contract, Plaintiff's credit report was adversely
affected and he suffered the damages as outlined in the Amended Complaint ¶¶ 42 – 46.

## COUNT II

## VIOLATION OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALINGS

"The rule is clear in Massachusetts that every contract is subject to an implied
covenant of good faith and fair dealing." Anthony's Pier Four, Inc. v. HBC Associates,
411 Mass. 451, 473, 583 N.E.2nd 806 (Mass. 1991) citing Warner Ins. Co. v.

Commissioner of Ins., supra, 406 Mass. at 362 n. 9, 548 N.E.2d 188. Kerrigan v. Boston, supra, 361 Mass. at 33, 278 N.E.2d 387.

Defendant argues that the covenant of good faith and fair dealing is only recognized in employment cases where there was a bad faith termination of the employee however this legal position is not relevant to the case at hand since Gachago did not plead any unlawful "employment" practice. The nexus of this Complaint is the policies and procedures involved in the submission and authorization of E/R (and AMEX) charges and the obligations imposed on or assumed by each of the parties. Although the contractual issue originated in an employment relationship, this fact does not impose a legal limitation on the analysis of a breach of contract claim.

Notwithstanding that distinction, an important employment/contract case is Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (Mass 1977). In Fortune, the Court examined the rights of an at-will employee and fashioned a remedy on the express contract thus recognizing "the general requirement in this Commonwealth that parties to contracts and commercial transactions must act in good faith toward one another. Good faith and fair dealing between parties are pervasive requirements in our law; it can be said fairly, that parties to contracts or commercial transactions are bound by this standard. See G.L. c. 106, s 1- 203 (good faith in contracts under Uniform Commercial Code); G.L. c. 93B, s 4(3)(c) (good faith in motor vehicle franchise termination). Id. at 102

The Amended Complaint details the extensive Corporate control (i.e., policies) that formed the basis of the contract between BMS and Gachago. Plaintiff acknowledges that BMS had a legitimate business interest in controlling the use of the AMEX

Corporate card and to ensure accurate expense reporting and AMEX charge verification. Concurrently, Plaintiff authorized and agrees that BMS should have final authorization of all charges, and the ability to reconcile E/R prior to the final payment of wages. However once that obligation was met and the wages paid in full, the Defendant should be estopped from imposing further restraints/procedures upon its former employees.

As stated in Warner Ins. Co v. Commissioner of Ins., 406 Mass. 354, 362, 548 N.E.2d 188 (Mass. 1990): The agreement is to be read 'in a manner to give effect to the chief design to be accomplished by the instrument,' and [courts] are to look 'through the form to the substance and purpose of the agreement' and to mould the decree 'in accordance with what the parties may fairly be presumed to have intended. Every contract implies good faith and fair dealing between the parties to it."

At point, the substance and purpose of the credit card agreement/procedures was to allow Gachago the ability to effectively entertain clients while holding him accountable for his expenses in as efficient a manner as possible. "It has been explained that the implied covenant exists so that the objectives of the contract may be realized. See Crellin Technologies, Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir.1994).

In contrast to the good faith intention of the contract governing the use of the AMEX card, Defendant failed to employ the contractual procedures available to it, thus breaching its obligation to the Plaintiff (and AMEX). Similarly, Defendant did not act in good faith when it reached beyond the employee relationship and burdened Gachago's personal credit report. The act of trying to enforce new conditions (i.e., audit your account and "the hold" will be lifted) after he had satisfied all of his original contractual obligations could (by a jury) be considered "bad faith." The resulting (credit related)

damages were the foreseeable result of Defendant's (breach and) violation of the Implied Covenant of Good Faith and Fair Dealings. Consequently, Defendant's Motion to Dismiss on this count should be denied.

## COUNT III

### INTENTIONAL INTERFERENCE WITH A CONTRACT

Plaintiff acknowledges that Defendant, BMS, was an instrumental part of the contract between AMEX and Gachago and this count should be dismissed.

## COUNT V

### INTENTIONAL INTERFERENCE WITH AN EMPLOMENT RELATIONSHIP

Plaintiff agrees with the elements of a claim of intentional interference with an employment relationship as cited in Avash v. Dana-Farber Cancer Institute, 443 Mass 367, 394-395 (2005) and contends that those elements have been met in the Amended Pleading.

In Plaintiff's resignation letter, incorporated by reference ¶ 22 , Gachago states: "I have chosen to pursue an endeavor that I believe will allow me the opportunity for personal and professional growth in many ways. . . As a consequence I have made a decision to pursue this new opportunity." See Motion in Opposition Exhibit 1. These statements in Plaintiff's Letter of Resignation are sufficient at this 12(b)(6) stage to put defendant on notice as to elements 1) an advantageous employment relationship and 2) the defendant's knowledge of such relationship. No recounting of conversations with BMS supervisors regarding future employment were pleaded and cannot be stated here.

As to the third element, intentional interference with improper means, Plaintiff references its argument as presented in the Violation of Good Faith and fair Dealing. At this stage of the discovery process, Plaintiff has no proof of improper means, however the

Pleadings do include factual allegations regarding BMS' proven ability to take "the hold" off Gachago's new card with Astra Zeneca.[6] Based on this ability to dictate AMEX's collection procedures, plaintiff can only speculate (at this stage of litigation) as to what role BMS played in putting "a hold" on the competitor's card in the first place and/or surreptitiously ¶32 getting the delinquency placed on Gachago's personal credit report.

Additionally, Plaintiff states: "two other Territory Business managers, David Tetto and Wesley Echols, were also held liable for unpaid non-business expenses that they had no knowledge of prior to their unemployment from BMS." ¶ 78 Accepting Plaintiff's pleadings as true, proof of this practice (i.e., reaching beyond the employment relationship to incur charges or make the transition to a new employer more burdensome) could be considered "intentional interference with improper means or motive."

The last element is satisfied in when Plaintiff stated that "he was forced to pay for the meal with personal monies" and Gachago's performance with his new employer was restricted in reaching his/its business promotional objectives. ¶¶ 32, 98 As stated in the Covenant of Good Faith discussion, the purpose of issuing a Corporate card to a field representatives is to make it "easier to promote the business," to raise revenues, and to maximize personal bonuses. The use of one's personal card for business purposes is burdensome and "costly" in many ways including but not limited to spending limits, personal finance charges, tax reporting, professional reputation, and administrative downtime.

---

[6] The idea that Gachago had to "bargain" with BMS to get "the hold" taken off the Corporate card of a subsequent employer seems to be (almost) unconscionable in and of itself.

Plaintiff has pleaded all the elements of an intentional interference with an
employment relationship in sufficient clarity to put BMS on notice and the Motion to
Dismiss should be denied.

4/27/2004

Joe Deluca
District Business Manager
Bristol Myers Squibb
27 Hyde Avenue,
Pawtucket, RI 02861

Dear Joe,

## RESIGNATION LETTER

I am writing to give my 4-week notice of resignation from Bristol Myers
Squibb. I have chosen to pursue an endeavor that I believe will allow me the
opportunity for personal and professional growth in multiple ways.

In leaving I reflect on my experience with BMS as being an overall a positive
one. However there comes a time when one has to question whether they
have fulfilled their purpose where they are. I believe the answer in my case
is a resounding yes. As a consequence I have made a decision to pursue this
new opportunity. Nevertheless I have established some lifelong relationships
that will always keep me connected to BMS. As a matter of fact I credit BMS
for allowing me to develop a familiarity with the Pharmaceutical industry as a
whole. While you have may only been DBM for the last 3 months it has been
a pleasure getting to know you to say the least. I wish you every success in
your career.

Do keep in mind that I am always only a phone call away if I can be of any
help. As I make my transition I hope and expect to ensure that my area of
responsibility is left significantly better off than I found it. Kindly pass my
very best to the Providence Patriots District team that, in many respects, has
been like a family to me.

Sincerely,

John Gachago
Territory Business Manager
SE Massachusetts

CC:    Elaine Feranacci –Region Business Director
       Bristol Myers Squibb Human Resources Dept

## CERTIFICATE OF SERVICE

**The undersigned hereby certifies** that a true copy of the Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss was this day served upon Defendant, Bristol-Meyers Squibb by U.S. Mail, prepaid first class to the Attorney of record, Eve Slattery.

SIGNED under the pains and penalties of perjury,

Dated: August 19, 2005

_____
Doug Surprenant BBO # 651975
Law Office of Doug Surprenant
55 N. Franklin Street
Holbrook, MA 02343
(781) 767-9300
(781) 767-9303 (Fax)