UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                          )
JOHN GACHAGO,                             )
        Plaintiff                         )
                                          )      CIVIL ACTION NO.
v                                         )
                                          )      05-10141-RGS
BRISTOL MYERS SQUIBB, and                 )
AMERICAN EXPRESS,                         )
        Defendants                        )
                                          )
```

## AMENDED PLEADINGS

### COMPLAINT - CAUSE OF ACTION



I.   Breach of Contract
II.  Violation of Implied Covenant of Good Faith and Fair Dealings
III. Intentional Interference with a contract
IV.  Violation of Fair Credit Reporting Act 15 U.S.C §1681 et seq. and
     M.G.L.c.93 §54
V.   Intentional Interference with an Employment Relationship

### STATEMENT OF FACTS

1. The Plaintiff, JOHN GACHAGO (hereinafter "Plaintiff" or "Gachago") lives at

   21 Linden Park Drive, Randolph, MA 02368 and was employed as a Territory

   Business Manager for Bristol Myers Squibb in the S E Massachusetts territory

   from May 2000 until May 3rd 2004.

2. The Defendants Bristol Myers Squibb (hereinafter "BMS" or "Company") a

   corporation duly organized under the laws of the state of Delaware and American

   Express Company (hereinafter "AMEX") organized under the laws of the state of

   New York and whose usual places of doing business respectively are 200 Vessey

Street, New York, NY 10154 and 345 Park Ave, New York, NY 10154 and

whose agent in common the state of Massachusetts is CT Corporation System

located at 101 Federal Street Boston MA 02110.

3. The job description of Gachago as a Territory Business Manager was to call on
approximately ten physicians a day to encourage them to prescribe from the
provided portfolio of BMS prescription drugs. Gachago was evaluated based on
the effective and exhaustive use of his promotional budget and the resulting
prescription volume growth.

4. Gachago was provided a monthly budget which varied from $5,000 to $8,000 a
month. The budgeted monies were used to schedule and attend lunches and
dinner entertainment that functioned as promotional /educational events for the
physicians in his SE Massachusetts Territory.

5. In addition to the promotional budget, BMS paid for all operating expenses such
as but not limited to stationary, fuel, cell phone, and high speed internet access.
The company also provided a laptop computer and a company vehicle along with
the corresponding insurance coverage. Submitted expense reports ranged
between $750 to $2500 or more per month.

6. After approximately two years of employment, BMS required Plaintiff to sign an
"American Express Corporate Charge Card Program" agreement (hereafter "BMS
Credit Agreement" or "Exhibit 1"). Plaintiff had to sign this agreement in order
for an American Express card to be released to him. On July 8, 2002, Gachago
signed the agreement and was issued an American Express Corporate Card that
had both his name and Bristol-Meyers Squibb inscribed on it.

Related Services Company, Inc." (hereinafter AMEX Credit Agreement" or "Exhibit 2.")

12. Section 2 of the AMEX Credit Agreement states: "You agree to use the Corporate Card solely for commercial business purposes in accordance with Company policy." (The "Company policy" as referenced in Exhibit 1)  Furthermore under section 5 outlining liability, it reads: "You as the Corporate Cardmember are responsible for all Charges billed to your account. All business Charges are to be reported to the Company for expense report processing in accordance with Company policy. All business Charges billed to the Corporate Card which are reimbursable by the Company will be paid by you or paid directly by the Company."

13. Plaintiff contends that during the term of his employment, approximately 90- 95% of each AMEX bill was paid directly to AMEX by BMS.

14. AMEX Credit Agreement states in section 6: "Payment for all Charges is due immediately upon receipt of the billing."  To determine if a payment was late, AMEX provided a "closing date" with each statement "which is the cutoff date we determine for including Charges and payments for that billing period." (Exhibit 2, paragraph 7 "Late Fees")  Additionally, "If any amount totaling more than $35.00 is unpaid for two billing periods, then the late fee will be the greater of $29 or 2.75% of all amounts unpaid for at least one billing period."  Payments for three or more billing periods had an additional penalty charge.

15. Plaintiff has no recollection of any late charges or fees assessed against the Corporate card during his four years of employment with BMS.

16. As a service, AMEX offered in paragraph 8: "If you have any questions, problems, or disputes concerning the monthly statement, you should contact us immediately and we will take all reasonable and appropriate steps to provide the information you request or to resolve your dispute."

17. As per Company policy, Gachago submitted expense reports on a monthly basis. The procedure included reviewing the American Express bill each month and "signing off" on the business expenses by submitting his expense report to BMS. Although a hard copy was mailed to Plaintiff, AMEX and BMS offered on-line services. In accordance with accepted procedure, Gachago downloaded, audited, and submitted his expense report on-line on the company provided computer.

18. Plaintiff asserts that almost every monthly AMEX bill showed a balance forward. As proof, Gachago offers the only bills that he has access to (see Exhibit 3) in particular February, March, April, and May 2004 which show a fluctuating balance starting at $947.67 and ending at $1,595.47 with a high of $2,244.36.

19. The AMEX amount due varied each month and Gachago believes that the balance forward was caused by the non-coordinated billing among Gachago's expense report filings, AMEX billing cycles and BMS payment system. On a couple of occasions over the previous two years, AMEX called Gachago directly questioning the late payments. In all cases, the difference in billing cycles seemed to explain the tardiness. No additional payment to AMEX was ever required by Plaintiff.

20. If payment had been past due to AMEX, then based on the AMEX Credit
Agreement clauses 6 and 7 (Exhibit 2), Plaintiff would have been assessed late
fees. Plaintiff has no record of late fees until after leaving the employ of BMS.

21. On or about the fall of 2002, District Sales Manager Colleen Davis questioned the
amount of gasoline charges on Gachago's expense report. The amounts in
question were clarified by Ms. Davis and Region Business Director Keith Spiers
without additional payment by Gachago. Other than that one discussion, Plaintiff
believes that all expense accounts were accepted by the Company as submitted.

22. On April 27th 2004, Plaintiff gave BMS a 4-week notice of resignation. Rather
than wait the four weeks or even the customary two week period, Gachago was
asked to complete a final expense report and make arrangements to return all
company material for a final close out by May 3rd 2004.

23. On or about April 30, 2005, Plaintiff submitted his final expense report for
$793.63. Based on this expense report, BMS paid $635.17 directly to AMEX for
credit card charges and $158.46 to Gachago for business expenses made with
personal monies.

24. On May 3, 2004, Gachago delivered the company car, computer and other
company materials to Joe Deluca (acting District Sales Manager for BMS) at the
Providence Marriott in Rhode Island for the final close out. Joe Deluca
completed a checklist which included the completed final expense report
confirming that all company property had been returned and the Plaintiff could be
"closed out" i.e., Gachago's employment with and responsibilities to BMS were
complete.

25. At no time, neither upon submission of his final expense report nor during the "close out" procedure did BMS inform Plaintiff that there were any un-reconciled expense reports or any balance due.

26. On or about May 9, 2004, Gachago took a job with Astra Zeneca doing substantively the same job as he was doing with BMS.

27. On or about May 10, 2004, Gachago received his final paycheck and severance package from BMS with payment in full, no deductions.

28. On or about June 1, 2004, Plaintiff received his final performance bonus check from BMS, with payment in full, no deductions.

29. On or about July 19, 2004, Gachago received a past due notice from American Express for $1,115.90 (which included $32.40 in new charges). Plaintiff believed this amount was indicative of the uncoordinated or late payments by BMS to AMEX as had been the case on all previous occasions and he did not feel any action on his part was due at that time.

30. Plaintiff had no other contact with BMS or AMEX until Plaintiff returned from a three week vacation at the end of August and found a message on his answering machine from AMEX regarding a balance due on the Corporate card.

31. Starting August 27, 2004, Plaintiff made numerous phone calls to AMEX and BMS and sent many emails to BMS in an attempt to get BMS to acknowledge liability and to pay the outstanding charges.

32. On or about, September 1, 2005 Plaintiff took two physicians out to dinner, but when he went to pay with the AMEX Corporate card issued by his new employer,

Astra Zeneca, he discovered that a hold had been placed on that card and he was forced to pay for the meal with personal monies.

33. On September 2, 2005 the Travel Card Administrator for BMS sent Gachago a document "TE – Travel Card Administrative – External Procedure." (Hereinafter "Audit Procedure" or Exhibit 4) so that Gachago could reconcile the past due balance of $1,149 and BMS could then pay any monies due to AMEX.

34. On September 3, after many frustrating attempts to get the liability properly assigned to BMS and to get the hold taken off his new Astra Zeneca Corporate credit card, and after Sandy at AMEX told Gachago that she would not initiate contact with BMS, Cathy Everk from BMS finally contacted AMEX and "let them know of the situation." (See Exhibit 5, page 1) Shortly thereafter, AMEX took the hold off his new AMEX corporate card with Astra Zeneca

35. Because BMS sent Gachago the forms to reconcile past expense reports, and because BMS contacted AMEX to get the "hold" taken off his new card, Plaintiff believed that BMS, with the understanding of AMEX, was taking responsibility for the past due amount and Plaintiff would be liable to BMS for any non-business charges.

36. The Audit Procedure (Exhibit 4) allowed BMS to not only audit terminated employees, but also "active employees with credits" and those with "suspected abuse." As a consequence, the procedure states, "If the audit concludes there is abuse on the corporate card, your manager will be notified and the account suspended. Human Resources will be notified depending upon the extent of the abuse."

37. The two page audit procedure form has eleven check points to audit one's own expense reports and Plaintiff was asked to review two years of expense reports to see which charges had not been appropriate for expense report submission. Gachago's last date of employment was May 3, 2004, however rather than send Gachago the last twelve months, BMS sent Plaintiff expense reports dated from Jan 2001 to May 2003.

38. Plaintiff was outraged that he was expected to reconcile expense reports that dates back over three years. Additionally, since Plaintiff believed that all his expense reports had been submitted correctly, he did attempt the audit procedure and did not submit an audited expense report.

39. Plaintiff asserts that BMS had the procedures in place and that he relied on those procedures to promptly audit his expense reports, to reprimand him if necessary, to deduct from his pay, and/or to suspend his BMS Corporate Card if there were any outstanding disputed charges.

40. Plaintiff asserts that AMEX had the procedures in place and that he relied on those procedures to promptly audit his credit card statements for past due balances and to call him on the phone as they had done in the past, to assess late charges as the AMEX Credit Agreement outlines, or to put a hold on his BMS Corporate Card.

41. In October 2004, Gachago began to get demand notices from GC Services Limited Partnership for $1,219.02 owed to American Express. On October 30, 2004 Plaintiff sent a "cease and desist" letter reiterating his belief that payment

should be demanded from BMS not John Gachago personally. GC Services
immediately stopped collection proceeding and returned the matter to AMEX.

42. On or around November 25, 2004, the Plaintiff applied to refinance his home so
he could remove $70,000 in equity so he could 1) put a down payment on a new
construction home in Florida for June relocation, and so he could 2) consummate
a Foreign Real Estate Development Investment in his homeland of Kenya
(hereinafter "Foreign Investment"). It was only at that time Gachago learned that
AMEX had reported the $1,219 in unpaid charges to the consumer reporting
agencies.

43. As a consequence of his lowered credit rating, the mortgage company denied his
application for refinance. Absent the equity money for the down-payment,
Gachago was not able to make the anticipated purchase at pre-construction prices.
The anticipated equity lost in purchasing the home at pre-construction prices
versus the value once built is approximately $35,000.

44. Similarly, Gachago has been unable to proceed with his commitment on the
Foreign Investment. In addition to the $7,500 already committed to this venture,
Plaintiff stands to lose $378,000 in potential profits. Additionally, Gachago may
face legal consequences from his unexpected withdraw from the Foreign
Investment.

45. Gachago has also been denied credit for office furniture and business equipment.

46. On or about November 4, 2005, Plaintiff did buy a (less desirable) home in
Florida for pending relocation but due to his poor credit rating, he had to accept a
30 year "228 variable mortgage" at the rate of 6.9%. If Plaintiff's credit was not

marred by the disputed AMEX charges, he believes that he would have received a

4.5% fixed rate. Without calculating the inevitable variable rate increases, the

poor credit rating will cost Plaintiff $155,865 over the term of the loan.

47. In December 2004, Plaintiff filed a Complaint pro se in Quincy District Court.

48. On or about January 24, 2005, Defendants removed this complaint to United

States District Court.

49. From March 10 to March 26, 2005, despite they fact that litigation had

commenced, AMEX called Plaintiff five (5) times and demanded payment for the

$1,219 amount in dispute.

50. Plaintiff has suffered and continues to suffer financial consequences and

considerable pain and suffering in trying to settle this matter.

## COUNT I - BREACH OF CONTRACT – BRISTOL-MEYERS SQUIBB

51. On July 8, 2002, Plaintiff signed a Company Credit Agreement (Exhibit 1). He

was required to sign the agreement in order to get the only Corporate credit card

available, the AMEX Corporate card. The "take it or leave it" and pre-set

conditions on this agreement made this a contract of adhesion and as a

consequence, all ambiguities should be decided in favor of the non-drafting and

disadvantaged party: Mr. Gachago.

52. For the two years prior and two years after signing the Company Credit

Agreement, Plaintiff followed established procedure and submitted monthly

expense reports. Each month, both Gachago and BMS paid AMEX directly; over

90% of each AMEX bill was paid directly by BMS.

53. BMS had Gachago's District Sales Manager review and approve each expense
    report. Similarly, the Auditing Procedure states that if there "is abuse on the
    corporate card, your manager will be notified and the account suspended. Human
    Resources will be notified depending on the extent of the abuse."

54. Plaintiff's expense report was only questioned once and that was almost two years
    ago and Gachago was never disciplined for any suspected violation on his
    expense account.

55. On May 3, 2004 Plaintiff returned all BMS property and his final expense report.
    According to standard BMS procedure, Plaintiff obligation to BMS ended and he
    was "closed out."

56. In addition to relying on the "close out" check list, the Company Credit
    Agreement provides that the "applicant agrees that Bristol-Meyers Squibb may
    withhold an amount equal to such charges from applicant's pay check, bonus,
    and/or severance payment."

57. Gachago's final expense report was approved in full and he received both his final
    pay and his bonus check. Plaintiff, like any reasonable person, believed that his
    expense account was in order and his obligation to BMS was complete.

58. BMS breached both the explicit Company Credit Agreement and the implicit
    monthly expenses report payment procedures established as a course of business.

59. BMS should be liable for the foreseeable consequences of their actions. Gachago
    believes BMS acted willfully to reach beyond the employment relationship;
    however even if the breach was due to negligence, BMS is liable. An employee,

Gachago, cannot be expected to contractually assume the risk of subsequent negligence on the part of his employer, BMS.

## COUNT I - BREACH OF CONTRACT – AMERICAN EXPRESS

60. To receive a BMS Corporate AMEX card, Gachago had to sign both the Corporate Credit Agreement (Exhibit 1) and an AMEX Credit Agreement (Exhibit 2). Plaintiff had to sign the agreement or cut his card in half, this was a contract of adhesion and as a consequence, all ambiguities should be decided in favor of the non-drafting and disadvantaged party: Mr. Gachago.

61. The AMEX Credit Policy required that the card be used solely for commercial business purpose in accordance with Company policy. Similarly, in the section on liability, AMEX reiterates the requirement that Gachago process his expense report in accord with Company policy and that "all business Charges billed to the Corporate Card which are reimbursable by the Company will be paid by you or paid directly by the Company."

62. This cited "liability" provision of the AMEX Credit Agreement allows for business Charges to be paid by the Company or the individual card holder. In Plaintiff's case, the record of payment indicates that over 90% of each bill was paid by BMS and a reasonable person would reasonably foresee BMS to be liable for 90% of any outstanding balance.

63. Since the Corporate Credit Policy stated that Gachago would be liable to the Company for non-business charges and since AMEX referenced this policy, AMEX must have had knowledge of this employee to employer liability. This knowledge coupled with an explicit payment history demonstrating that the vast

majority of the charges were for business purposes, AMEX knew or should have
that BMS would be paying the overwhelming share of this overdue balance and if
there were any non-business expenses Gachago would be liable to the company
for any inappropriate charges. Consequently, a reasonable debt collector would
have held BMS (at least jointly) liable for any unpaid balance.

64. There was always an outstanding balance on Plaintiff's Corporate Card. Plaintiff
believed these balances were due uncoordinated billing cycles and periodic
conversations with AMEX about late payments reinforced this understanding.

65. AMEX had monthly accounting procedures and had a set policy for assessing late
fees after two billing cycles. During the term of his contract with AMEX,
Plaintiff was never charged late fees as would have been required if an
outstanding balance was due. Since the billing practices of AMEX (and the
payment practices of BMS) were outside his control, Plaintiff relied on the
standard business practices of AMEX and absent specific notice communication,
he had reason to believe that as to his liability on the account, it was paid in full.

66. In section 8 of the AMEX Credit Agreement AMEX offers to take all reasonable
and appropriate steps to resolve the Cardholder's dispute; however when Plaintiff
contacted AMEX about the liability for the unpaid balance, they refused to
contact BMS to clear up the matter. Then when BMS contacted AMEX, the hold
was taken off Plaintiff's new card but instead the delinquency was reported to the
consumer reporting agencies unbeknownst to Gachago. Even after litigation
commenced, AMEX contacted Plaintiff by phone five times demanding payment.

67. AMEX breached both the explicit Company Credit Agreement by not promptly taking action on any unpaid balance until Plaintiff left BMS and the implicit contract of accepting delinquent payments from BMS such as to make the monthly statements meaningless and convincing the Plaintiff that his account was in good standing. In opposition to the contracts and the established payment procedure, AMEX held only the Plaintiff liable for the outstanding balance.

68. Defendant AMEX may argue that it was following accepted collection procedures by reporting the unpaid debt to the consumer reporting agencies, however, after two years of complete disregard to standard procedure, AMEX should be foreclosed from any defense of "standard collection practice." Once the explicit contract is breached, it cannot be relied upon as a defense.

69. AMEX should be liable for the foreseeable consequences of their actions and the damage caused by Plaintiff's tarnished credit rating. Gachago believes that rather than upset BMS, AMEX acted willfully to pursue collection against the disfavored joint liability cardholder, Mr. Gachago. Even if the breach was due to negligence, the disadvantaged party in a contract of adhesion should not be held liable for the negligence of the party that drafted it and who established the accepted procedures upon which the Plaintiff came to rely.

## COUNT II – VIOLATION OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALINGS - BMS and AMEX

70. All contracts have the implied covenant of Good Faith and Fair Dealings.

71. After a four year mutually beneficial relationship, Plaintiff offered BMS a generous four weeks notice. BMS choose to terminate the employment

relationship within one week and as required Gachago returned all company
property and his last expense report in a timely manner.

72. In accord, BMS reimbursed Gachago for his last expense report, paid him his
final paycheck, and two weeks later, paid him his final bonus check. By all
accounts, Plaintiff believed that he had acted properly in his business dealing with
BMS.

73. Similarly Gachago used the AMEX Corporate Card as his exclusive business
credit card. He processed monthly statement as required by Company policy and
was never assessed late charges or had his card privileges suspended in any
fashion.

74. However, it was not until after leaving the employ of BMS that the Company
became uncooperative: BMS refused to provide him specific details about unpaid
charges, BMS sent him antiquated expense reports that would make it impossible
to determine a recent non-business expense if there had been one, and even told
Plaintiff to not contact his immediate supervisor, Joe DeLuca, even though Mr.
DeLuca was the one who had the authority to accept or reject Gachago's expense
reports for the previous three months.

75. BMS had the opportunity to inform Gachago about any disputed charges at any
time before his resignation; similarly, there were procedures in place that would
have allowed a prompt resolution to these disputed charges; instead BMS choose
to not pay AMEX with no prior notice to Plaintiff and then made it extremely
difficult post-employment to explain and/or to remove the charges from his
personal record.

76. Plaintiff was led to believe that all past due balances on his AMEX card were due
    to the uncoordinated billing cycle that existed between the AMEX statement, the
    submission of the expense reports, and payment by BMS. AMEX did not follow
    any standard procedure nor did they make any effort to notify Plaintiff concerning
    an outstanding balance prior to his discharge from BMS.

77. AMEX contractually promised to "take all reasonable and appropriate steps" to
    resolve any dispute but when Plaintiff denied liability for the delinquent charges,
    AMEX refused to contact BMS to resolve the matter.

78. Since the initiation of litigation, Plaintiff has learned of two other Territory
    Business Managers, David Tetto and Wesley Echols, who were also held liable
    for unpaid non-business expenses that they had no knowledge of prior to their
    unemployment from BMS.

79. Defendants BMS, AMEX, and Gachago had a fruitful employment and billing
    relationship. All parties benefited financially from their relationship. However
    the defendants have chosen to reach beyond the employment relationship and
    outside the terms of their contractual agreements to cause Plaintiff to suffer
    financial injury and emotional distress. AMEX and BMS used their superior
    position to question Plaintiff's integrity and damage his personal credit rating;
    these actions violate the covenant of good faith and fair dealings that Mr.
    Gachago had relied upon during the term of these contracts.

## COUNT III – INTENTIONAL INTERFERENCE WITH A CONTRACT –BMS

80. The elements of Intentional Interference with a Contract are met: 1) Plaintiff had
    a contract with AMEX (and BMS) to use the Corporate American Express Card

for both business and personal expenses. As part of that contract, AMEX bills were mailed directly to Plaintiff's home; 2) BMS knew Plaintiff had a contractual obligation to AMEX since they required Plaintiff to be jointly liable; 3) BMS induced AMEX to break the contract; and 4) Plaintiff incurred financial damage as a result of the disputed balance being applied to his personal credit report.

81. Whether directly or indirectly, BMS induced AMEX to break their contract obligations to Gachago. BMS provides hundreds of its employees with AMEX Corporate Cards and these employees often charge thousands of dollars a month; this is a fruitful relationship for American Express.

82. AMEX knew that BMS approved every expense report monthly and AMEX had to accept the "in arrears" billing payment practice of BMS. By inducing AMEX to abandon their standard late fee procedure, Territory Business Managers, like Gachago were unaware of any (two year old) overdue balances and thus AMEX did not fulfill its contractual obligation to "shut off" Gachago's card privileges.

83. BMS disregarded its own audit procedures and collection options and expected AMEX to pursue Plaintiff and not BMS despite Plaintiff's contractual liability to BMS for all non-business expenses. (See Exhibit 1)

84. When this disputed liability became know to the Plaintiff, he requested that Ms. Everk, the BMS credit card administrator, contact AMEX to explain that the disputed amount was BMS' responsibility and to ask that the hold be taken off his current Amex card. By email MS. Everk told Gachago that she contacted AMEX "to let them know of the situation." As a result, the hold was taken off Gachago's new American Express card. At this point Plaintiff believed that the disputed

charges were properly re-classified as the responsibility of BMS. Unbeknownst
to Plaintiff, AMEX forwarded a notice of default concerning the disputed charges
to the consumer reporting agencies.

85. The communication between BMS and AMEX demonstrates that BMS induced
    AMEX to abandon their standard collection procedures. This illustrates an
    explicit communication from BMS to AMEX and a conscious decision to act and
    not just a mechanical bill collection procedure.

86. There is no legitimate business reason why BMS would ignore their contractual
    employment procedures to collect any monies due as opposed to inducing AMEX
    to breach its contract and attach liability to that employee's personal credit report
    and thus BMS' actions imply an improper motive.

## COUNT IV – VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C § 1681 ET SEQ. and M.G.L. c.93 § 54

87. Plaintiff acknowledges that all the charges in question were for business purposes.
    Whereas the Fair Credit Reporting Act and the Fair Credit Billing Act were
    enacted to protect consumers, many of the protections of the Acts apply only to
    consumer transactions. However it seems incomprehensible that Congress
    intended to protect consumers but would allow disputed business transactions to
    be treated as consumer debt and placed on personal consumer credit reports.

88. Even where inapplicable, the U.S. Supreme Court in *American Express Company
    v. Koerner* 452 U.S. 233, 101 S.Ct. 2281 (1981) has found that although a credit
    card issuer is free to adopt its own procedures for business transactions, they are
    obliged to follow those established procedures. *Id*. At 241  On point, if Plaintiff's

account was delinquent (for two years) as Defendant asserts, then AMEX should have followed its own established procedures as outlined on the AMEX Credit Agreement. Quite the opposite, AMEX called Plaintiff about unpaid charges, then acknowledged BMS late payments were at issue and AMEX never informed Plaintiff otherwise nor did they ever charge late fees as is their explicit policy.

89. Plaintiff does not allege a billing error; the issue at point is liability and thus Plaintiff falls under the protection of the appropriate provisions of the Fair Credit Reporting Act. Regulation Z, 46 Fed.Reg. 20847 and the statement accompanying the revision indicates that "cards issued for non-consumer credit purposes are covered only by the provisions regarding credit card issuance and liability." *Id.* At 244 FN10

90. All attempts by Plaintiff to properly assign the liability for the $1,219 occurred after his employment relationship with BMS had ended. All damages occurred to Plaintiff in his capacity of a consumer.

91. 15 U.S.C § 1681s-2 to provide a private cause of action for consumers against furnishers of information such as AMEX. Under 15 U.S.C. § 1681s-2(B)(I) "A person shall not furnish information relating to a consumer to any consumer reporting agency if the person has been notified by the consumer… that specific information is inaccurate." This applies to Plaintiff because the initiation of the charges are not in dispute, rather this case hinges on a determination as to liability for those charges.

92. Failure to comply with the requirements of § 1681s-2 subjects furnisher of information liability for statutory and actual damages. 15 U.S.C. § 1681o

93. Where not exempted, Defendant AMEX is also subject to the provisions of
    M.G.L. c 93 § 54A and the relief provided therein.

94. AMEX was in violation of the Fair Credit Reporting Act and M.G.L. c.93 § 54A
    when on March 10, March 12, March 17, March 21, and March 26, 2005
    Defendant contacted and attempted to collect the disputed debt despite knowledge
    that the matter was in litigation. (See Exhibit 6)

## COUNT V – INTENTIONAL INTERFERENCE WITH AN
## EMPLOYMENT RELATIONSHIP

95. Immediately after leaving the employ of BMS, Plaintiff went to work for Astra
    Zeneca acting in essentially the same capacity that he had with BMS. BMS knew
    or should have known that Gachago would continue to work in the capacity for
    which he was skilled and consequently, he would be working with a competitor of
    BMS.

96. Similarly, from past experience, BMS knew or should have known that AMEX
    was going to pursue Gachago personally (see Amended Pleadings paragraph 78)
    and if not satisfied, AMEX would report this disputed liability on Plaintiff's
    personal credit report.

97. A poor credit report can interfere with a future employment relationship either by
    effecting the initial employment decision (one of the accepted purposes of
    consumer credit reports) and/or by hampering the use of a new company credit
    card and its intended volume generating "promotional" purpose.

# *Phil A. Rodriguez*

*Attorney and Counselor at Law*
*38 North Ferry Street*
*Schenectady, New York 12305*
*Telephone: {518} 346-7275*
*Facsimile: {518} 372-5071*
*{Service by fax not accepted}*

September 15, 2005

Christopher R. Donato, Esq.
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210

RE: USA v. Mark Feinberg
Court #: 02-11917-RGS
Civil Action

Dear Mr. Donato,

As you know I am now representing Mark Feinberg, in reference to the above matter. His previous attorney Richard DiStefano has been suspended from the practice of Law as a result of financial problems involving clients funds.

At one time there was an agreement to settle this matter for $ 65,000.00. Mark Feinberg was in agreement and gave the funds to Mr. DiStefano to conclude the settlement. Unfortunately, the funds were never transferred from Mr. DiStefano's office to the U.S Attorney's office and unbeknownst to Mr. Feinberg communications ceased.

Presently, the total recovery by the United States, between the voluntary payment and garnishments, is $58,000.00. The documents that were turned over to me by Mr. DiStefano included a Motion which appears to be still pending.

We are anxious and prepared to resolve this matter without further litigation. Mark Feinberg should not be further punished financially for his prior attorney's shortcomings.

    If necessary I am willing to come to Boston and attend
a conference with you and the Court and finally bring this
matter to a conclusion that is fair to the Federal
Government and Mr. Feinberg.




Very truly yours,


PHIL A. RODRIGUEZ

PAR/kap

CC: Nancy Rojas
    Clerk of U.S. District Attorney



98. Plaintiff was harmed by BMS' interference since due to the hold on his new Astra
    Zeneca credit card, Plaintiff's employment performance and business promotional
    objectives were restricted to the use of limited personal resources.

99. Similarly AMEX is also liable to Plaintiff for subsequent harm, since AMEX
    specifically knew of Plaintiff's employment relationship with Astra Zeneca when
    AMEX reached beyond Gachago's personal credit standing and put a hold on
    Gachago's new employer's joint liability Corporate American Express card.

## DAMAGES

100.    Due to the unlawful actions of BMS and AMEX, Plaintiff not only
        suffered a business employment disadvantage, but also he suffered the
        embarrassment and financial hardship caused by the adverse delinquency notice
        on his personal consumer credit report.

101.    Plaintiff had no knowledge that AMEX had reported the delinquency to
        the consumer reporting agencies until the day he was turned down for a refinance
        loan on November 4, 2005. Gachago was refinancing to extract some of his
        home's equity to 1) make a down-payment on a home in Florida they were
        purchasing at pre-construction prices and 2) to consummate a Foreign Investment.

102.    Since Gachago was not able to refinance, he was not able to purchase the
        home at pre-construction prices. There was no opportunity to mitigate the
        damage caused by the subsequent delay and lose of post-construction equity -
        $35,000.

103.    Plaintiff has a responsibility to mitigate his damages, however Gachago
        had no notice that his consumer report was tarnished until after he made plans and

applied for a home refinancing. In furtherance, Plaintiff asserts that his obligation to mitigate should not include a requirement to pay off someone else's debt.

104.     Plaintiff filed suit pro se in November and hired an attorney on April 19, 2005. Shortly thereafter council asked AMEX to voluntarily remove the debt from Plaintiff's credit until litigation could be resolved. Defendant refused and Plaintiff filed a preliminary injunction on May 5, 2005.

105.     Other than paying off a debt that Plaintiff believed belonged to BMS, Plaintiff had no way to mitigate damages other than not borrowing any money for any reason.

106.     However, the need to get on with life does not stop and Mr. and Mrs. Gachago still had to complete arrangements to relocate to Florida. Plaintiff went ahead and purchased a home, though due to financial restraints, it was a less desirable home (i.e., lower priced) and Plaintiff is now straddled with a 30 year 6.9% variable rate mortgage as opposed to the desired 4.5% fixed rate.

107.     Over the term of the 30 year term of the mortgage, the higher 6.9% versus 4.5% interest rate will cost Plaintiff $155,865. Even if Plaintiff only lives in the home for ten years until his children finish high school, the additional interest will cost $51,955.20.

108.     Plaintiff is currently re-financing his home at 8.6% (due to his poor credit rating) and is trying to salvage the Foreign Investment which is expected to yield $378,000 in profits but the initial professional fees investment of $7,500 is already lost.

109.    Using only the lowest estimated damages as underlined, Plaintiff has had
$94,455.20 in actual damages. At the higher end, damages are $198,365; with an
additional potential profit of $378,000 from the Foreign Investment.

110.    All claims as to damages will be clarified through the discovery process
and will be verified to the Court at trial.

111.    Additionally Plaintiff feels betrayed and falsely accused of wrong doing
with no recourse but to either pay off a debt that is rightfully BMS' liability or to
suffer a damaging credit report. Plaintiff has acted with due diligence to properly
assign liability for the disputed charges and his time and aggravation should at
least equal the foreseeable damage that he has suffered due to the willful and/or
the negligent actions of the Defendants who held a far superior bargaining
position during the entire contractual and post employment periods.

J3/2005 16:42 FAX  6173711061

07/08/2002  18:27   4018613525                    JOHN GACHAGO                      ☑ 0 3/003
                                                                                   PAI E  01



Please read and sign the agreement sheet below and fax to the Travel Card Administrator at 609/419-7641.  Your AMEX card will not be released to you until it is received.

## AMERICAN EXPRESS CORPORATE CHARGE CARD PROGRAM

### AGREEMENT:

I.  The Applicant and Bristol-Myers Squibb through its authorizing officer,

(a) request that a Card be issued to the Applicant on the Company's account,

(b) authorize the receipt and exchange of credit information about both the Applicant and the Company, and

(c) agree to be bound by the terms and conditions of the Agreement(s) received with each Card ("Agreement").


II. The individual Applicant,

(a)  authorizes American Express to notify the Company if American Express decides to decline this application,

(b)  agrees to use the Card issued in connection with a business account opened in the Company's name,

(c)  agrees to use the Card issued for business purposes only, and

(d) ·  agrees to be liable for payment of all charges to the Card in accordance with the terms of the Agreement.  To the extent that Company guarantees or pays any charges on behalf of the individual Applicant, and such charges are found to have been incurred for personal / non-business purposes, the individual Applicant will be liable to Company for payment of all such personal, non-business charges and will pay Company immediately the amount of such charges. Should applicant not pay Company, applicant agrees that Bristol-Myers Squibb Company may withhold an amount equal to such charges from applicant's pay check, bonus, and/or severance payment.


Signature                                       John W. Gachago  7/8/02
                                                Print Name and Date




# Agreement Between Corporate Cardmember and American Express Travel Related Services Company, Inc.

Welcome to American Express® Corporate Cardmembership.

Read this Agreement thoroughly before you sign or use the enclosed American Express® Corporate Card. By signing, using or accepting the Corporate Card you will be agreeing with us to everything written here. Your use of the Corporate Card will be governed by this Agreement. If you do not wish to be bound by this Agreement, cut the Corporate Card in half and return the pieces to us. If you do stop the Corporate Card you should not use it before the valid date or after the expiration date printed on the face of the Corporate Card.

## 1. Definitions

As you read this Agreement, remember that the words "you", "your" or "Corporate Cardmember" mean the person named on the enclosed Corporate Card. The words "American Express", "us", "our", "we", and "us" refer to American Express Travel Related Services Company, Inc. The word "Company" means the entity approved by American Express to offer Corporate Card to its employees and whose name appears on the Corporate Card. The word "account" means your Corporate Card account. [illegible] "Card" means [illegible]

## 2. Use of Card

You [illegible] ...

Corporate [illegible] ... voluntarily [illegible] ... person, you will be liable [illegible] ... allowable by applicable law, spending limits may be placed on your Corporate Card, either at the request of your Company or at the discretion of American Express. Should your Corporate Card account be subject to spending limits, you will be notified in writing. You agree that you will not resell or return for a cash refund any goods, tickets, or services obtained with the Corporate Card. Obviously, you may return any item or ticket to an establishment honoring the Corporate Card for credit to your account, if that establishment permits such returns. We reserve the right to deny authorization for any Charge.

## 3. Charges

All amounts charged to your account, including, without limitation, purchases, cash advances, travelers cheque encashments, any annual Corporate Card fee and other fees will be called "Charges" in this Agreement. Charges also include any purchases in which you have evidenced an intent to incur a charge, regardless of whether you have signed a charge form.

## 4. Charges Made in Foreign Currencies

If you incur a Charge in a foreign currency, it will be converted into United States dollars on the date it is processed by us or our agents at a rate set by us based on an interbank, tourist or (where required by law) official rate, increased in each instance up to 2%. This rate may differ from rates in effect on the date of your Charges. Amounts converted by common carriers, such as airlines, will be billed at rates the carriers use.

## 5. Liability

You as the Corporate Cardmember are responsible for all Charges billed to your account. All business Charges are to be reported to the Company for expense report processing in accordance with Company policy. All business Charges billed to the Corporate Card which are reimbursable by the Company will be paid by you or paid directly by the Company under the Company's expense procedures applicable to you. You, as the Corporate Cardmember, are accountable for any reimbursements and agree to remit such funds to us promptly. This Agreement has no effect on such procedures or your right to

reimbursement or payment by the Company. To the extent that you, as the Corporate Cardmember, fail to honor any of the obligations under this Agreement, we reserve the right to collect the amount of such Charges directly from you.

## 6. Payments

Payment for all Charges is due immediately upon receipt of the billing statement we mail to you. You must notify us immediately of any change in your billing address. You must pay us in U.S. currency, with a draft or check drawn on a U.S. bank and payable in U.S. dollars, or with a negotiable instrument payable in U.S. dollars and clearable through the U.S. banking system. If we decide to accept payment made in some other form, your payment will not be credited until it is converted into one of the forms described above. We may charge you any costs we incur in converting your payment. If any payment made on your account is not honored for its full amount, we may charge your account $25 to cover collection costs on that payment. [illegible] ... We may accept late payments, partial payments, or any payments marked [illegible] ...

## 7. Late Fees

We will send you a billing statement at the end of each billing period (intervals of approximately one month). Each billing statement will identify a "Closing Date" which is the cutoff date we determine for including Charges and payments for that billing period. If Charges on a billing statement remain unpaid, we may assess a late fee. The amount of the late fee depends on the length of time your account has remained unpaid and the address to which your bill is sent. Late fees will accrue as follows, unless prohibited by applicable state law:

A. If any amount totaling more than $35.00 is unpaid for two billing periods, then the late fee will be the greater of $29 or 2.75% of all amounts unpaid for at least one billing period; and

B. If any amount totaling more than $35.00 is unpaid for three or more billing periods, then there will be an additional late fee of the greater of $29 or 2.75% of all amounts unpaid for at least one billing period.

For the purpose of calculating late fees, we will disregard amounts owed for any annual Corporate Card fee or amounts to be repaid to us for insurance premiums. Late fees will not exceed the maximum allowed by law.

## 8. Problem with Goods and Services

If you have any questions, problems or disputes concerning the monthly statement, you should contact us immediately and we will take all reasonable and appropriate steps to provide the information you request or to resolve your dispute. However, unless required by law, we are not responsible for any problems you have with any goods or services you charge on the Corporate Card; and, if you have a dispute with an establishment honoring the Corporate Card, payment must be made and the dispute settled directly with the establishment. We will not be responsible if any establishment refuses to honor the Corporate Card or for any other problems you may have with such establishment.

DUPLICATE COPY

## Corporate Card
## Statement of Account

**Sign-up For Online Statements**

www.americanexpress.com/checkyouri ill

| Prepared For | Account Number | Closing Date | |
|---|---|---|---|
| JOHN W GACHAGO | 3794-781209-61009 | 04/29/04 | Page 1 of 4 |
| BRISTOL-MYERS SQUIBB | | | |

**Balance Please Pay By Due $ 05/15/04**

| Previous Balance $ | New Charges $ | Other Debits $ | Payments $ | Other Credits $ | |
|---|---|---|---|---|---|
| 2,244.36 | 1,209.35 | 0.00 | 1,858.24 | 0.00 | 1,595.47 For important informatio regarding your account refer to page 2. |

Your account is 30 days past due. Please submit all outstanding expenses to avoid possible suspension.

Contact us at www.americanexpress.com/checkyourbill or call Customer Service at 1-800-528-2122.

## Activity    Date reflects either transaction or posting date

### Card Number 3794-781209-61009

| | | Reference Code | Amount |
|---|---|---|---|
| 04/23/04 | PROCEEDS OF EXPENSE VOUCHER    04/23    EXPENSE REPORT # TEA100238408 | 06060000000 | -1,858.2 |
| 04/01/04 | GETTY 30344001    RANDOLPH    MA    GETTY    GAS/MISC    091001000004 03/31/04    GAS/MISC    091001000004 | | 27.0( |
| 04/03/04 | EXXONMOBIL5907783871EAST TAU    MA    PAY AT PUMP5907783871    04/02/04    PAY AT PUMP5907783871    ROC NUMBER    WY88112 | | 10.0( |
| 04/06/04 | EXXONMOBIL2609714320NEW BEDF    MA    PAY AT PUMP2609714320    04/05/04    PAY AT PUMP2609714320    ROC NUMBER    0V84403 | | 27.0( |
| 04/08/04 | EXXONMOBIL2609626466PLYMOUTH    MA    PAY AT PUMP2609626466    04/07/04    PAY AT PUMP2609626466    ROC NUMBER    LZ93313 | | 10.0: |
| 04/08/04 | SUNOCO    0663548601RANDOLPH    MA    SUNOCO    0029453    009911449    04/08/04    0029453    009911449    ROC NUMBER FUEL/MISC | | 8.0( |
| 04/09/04 | EXXONMOBIL2609626466PLYMOUTH    MA    PAY AT PUMP2609626466    04/08/04    PAY AT PUMP2609626466    ROC NUMBER    LZ92858 | | 11.11 |

Continued on Page 3

↓ Please fold on the perforation below, detach and return with your payment ↓

## Payment Coupon

| Account Number | Please Pay By | Payable upon receipt in |
|---|---|---|
| 3794-781209-61009 | 05/15/04 | U.S. Dollars. |

Please enter account number on all checks and correspondence.

JOHN W GACHAGO
BRISTOL-MYERS SQUIBB
21 LINDEN PARK DR
RANDOLPH    MA    02368-4703

**Total Amount Due $1,595.47**

Checks or drafts must be drawn against banks located in the U.S.

Check here if address, telephone number, or e-mail address has changed. Note changes on reverse side.

Mail Payment to:

AMERICAN EXPRESS
P.O. BOX 1270
NEWARK NJ 07101-1270

000037947812096100 9 00015954700012093 5 29HH

DUPLICATE COPY

## Corporate Card
## Statement of Account

**Sign-up For Online Statements**

www.americanexpress.com/checkyourb !

| Prepared For | Account Number | Closing Date | |
|---|---|---|---|
| JOHN W GACHAGO | 3794-781209-61009 | 03/30/04 | Page 1 of 5 |
| BRISTOL-MYERS SQUIBB | | | |

**Balance Please Pay By Due $ 04/15/04**

| Previous Balance $ | New Charges $ | Other Debits $ | Payments $ | Other Credits $ | |
|---|---|---|---|---|---|
| 1,044.71 | 1,827.77 | 0.00 | 628.12 | 0.00 | 2,244.36 For important information regarding your account refer to page 2. |

Your account is 30 days past due. Please submit all outstanding expenses to avoid possible suspension.

Contact us at www.americanexpress.com/checkyourbill or call Customer Service at 1-800-528-2122.

## Activity    Date reflects either transaction or posting date

### Card Number 3794-781209-61009

| | | | Reference Code | Amount $ |
|---|---|---|---|---|
| 03/16/04 | PROCEEDS OF EXPENSE VOUCHER | 03/16 | 0606000000 | -628.12 |
| | EXPENSE REPORT # TEA100221029 | | | |
| 03/01/04 | EXXONMOBIL3401243310WYOMING | R I | | 26.44 |
| | PAY AT PUMP3401243310 | 02/29/04 | | |
| | PAY AT PUMP3401243310 | | | |
| | ROC NUMBER    UB92785 | | | |
| 03/03/04 | EXXONMOBIL3401343243HYANNIS | MA | | 31.00 |
| | PAY AT PUMP3401343243 | 03/02/04 | | |
| | PAY AT PUMP3401343243 | | | |
| | ROC NUMBER    M9U4222 | | | |
| 03/05/04 | SUNOCO    0012137608HANOVER | MA | | 29.37 |
| | SUNOCO    0048718    006536916 | 03/04/04 | | |
| | 0048718    006536916 | | | |
| | ROC NUMBER FUEL/MISC | | | |
| 03/10/04 | GETTY 30344001    RANDOLPH | MA | | 25.03 |
| | GETTY    GAS/MISC    069001000005 03/09/04 | | | |
| | GAS/MISC    069001000005 | | | |
| 03/12/04 | GETTY 30344001    RANDOLPH | MA | | 24.50 |
| | GETTY    GAS/MISC    071001000010 03/11/04 | | | |
| | GAS/MISC    071001000010 | | | |
| 03/16/04 | EXXONMOBIL5903410420BRAINTRE | MA | | 25.90 |
| | PAY AT PUMP5903410420 | 03/15/04 | | |
| | PAY AT PUMP5903410420 | | | |
| | ROC NUMBER    SZ29176 | | | |

Continued on Page 3

↓ Please fold on the perforation below, detach and return with your payment ↓

**Payment Coupon**

Account Number
3794-781209-61009

**Please Pay By 04/15/04** Payable upon receipt in U.S. Dollars.

Please enter account number on all checks and correspondence.

JOHN W GACHAGO
BRISTOL-MYERS SQUIBB
21 LINDEN PARK DR
RANDOLPH    MA    02368-4703

**Total Amount Due $2,244.36**

Checks or drafts must be drawn against banks located in the U.S.

Check here if address, telephone number, or e-mail address has changed. Note changes on reverse side.

Illloobdullulldabdubdulloollloolluolluolloblubldll

Mail Payment to:    AMERICAN EXPRESS
P.O. BOX 1270
NEWARK NJ 07101-1270

Illlubulluolllllboooallodllobllloolllllubdubbooolldl

000037947812096100S 00022443600018277? 30HH

DUPLICATE COPY

## Corporate Card
## Statement of Account

**Sign-up For Online Statements**

www.americanexpress.com/checkyour il

| Prepared For | Account Number | Closing Date |
|---|---|---|
| JOHN W GACHAGO | 3794-781209-61009 | 02/29/04 |
| BRISTOL-MYERS SQUIBB | | Page 1 of 4 |

| Previous Balance $ | New Charges $ | Other Debits $ | Payments $ | Other Credits $ | **Balance Please Pay By Due $ 03/16/04** |
|---|---|---|---|---|---|
| 1,755.27 | 451.68 | 0.00 | 1,162.24 | 0.00 | 1,044.71 |

For important informatic n regarding your account refer to page 2.

Your account is 30 days past due. Please submit all outstanding expenses to avoid possible suspension.

Contact us at www.americanexpress.com/checkyourbill or call Customer Service at 1-800-528-2122.

## Activity
Date reflects either transaction or posting date

### Card Number 3794-781209-61009

| | | Reference Code | Amount |
|---|---|---|---|
| 02/13/04 | PROCEEDS OF EXPENSE VOUCHER 02/13 EXPENSE REPORT # TEA100197857 | 06068000000 | -1,162.2 |
| 02/17/04 | EXXONMOBIL7504216404STOUGHTO MA PAY AT PUMP7504216404 02/16/04 PAY AT PUMP7504216404 ROC NUMBER QH35083 | | 25.0 |
| 02/18/04 | 86 MAZZEO DRIVE RT 1RANDOLPH MA SHELL OIL 27540382705049383040745 02/17/04 27540382705049383040745 ROC NUMBER 0108019ISL | | 25.2 |
| 02/23/04 | SUNOCO 0663548601RANDOLPH MA SUNOCO 0019543 005431455 02/22/04 0019543 005431455 ROC NUMBER FUEL/MISC | | 25.4 |
| 02/24/04 | 1808 WASHINGTON STREHANOVER MA SHELL OIL 11105220179055205001591 02/23/04 11105220179055205001591 ROC NUMBER 0109637MIS | | 29.0 |
| 02/24/04 | 86 MAZZEO DRIVE RT 1RANDOLPH MA SHELL OIL 27540382705055377053321 02/23/04 27540382705055377053321 ROC NUMBER 0117960MIS | | 8.0 |
| 02/25/04 | CUMBERLAND FARMS 213DARTMOUTH MA SERVICE STA405612180203 02/24/04 SERVICE STA405612180203 ROC NUMBER 593971 | 00000524944 | 12.4 |

Continued on Page 3

↓ Please fold on the perforation below, detach and return with your payment ↓

**Payment Coupon**

| Account Number | Please Pay By |
|---|---|
| 3794-781209-61009 | 03/16/04 |

Payable upon receipt in U.S. Dollars.

Please enter account number on all checks an correspondence.

JOHN W GACHAGO
BRISTOL-MYERS SQUIBB
21 LINDEN PARK DR
RANDOLPH        MA    02368-4703

**Total Amount Due
$1,044.71**

Checks or drafts must be drawn against banks located in the U.S.

Check here if address, telephone number, or e-mail address has changed. Note changes n reverse side.

Mail Payment to:       AMERICAN EXPRESS
P.O. BOX 1270
NEWARK NJ 07101-1270

00003794781209b1009 0001044710000451b8 29AA

DUPLICATE COPY

**Corporate Card
Statement of Account**

**Sign-up For Online
Statements**

www.americanexpress.com/checkyourb

| Prepared For | Account Number | Closing Date | |
|---|---|---|---|
| JOHN W GACHAGO | 3794-781209-61009 | 01/30/04 | Page 1 of 3 |
| BRISTOL-MYERS SQUIBB | | | |

**Balance Please Pay By
Due $ 02/15/04**

| Previous Balance $ | New Charges $ | Other Debits $ | Payments $ | Other Credits $ | |
|---|---|---|---|---|---|
| 947.67 | 800.88 | 27.71 | 0.00 | 20.99 | 1,755.27 For important information regarding your account refer to page 2. |

Your account is 60 days past due. Submit all outstanding expenses to avoid possible cancellation.

Contact us at www.americanexpress.com/checkyourbill or call Customer Service at 1-800-528-2122.

**Activity** Date reflects either transaction or posting date

**Card Number 3794-781209-61009**

| | | | | Reference Code | Amount $ |
|---|---|---|---|---|---|
| 12/31/03 | MUTUAL                BRAINTREE 000002665 SALES/SERVICES/REPAIR SALES/SERVICES/REPAIR | | MA 12/30/03 | 00000002665 | 22.70 |
| 01/06/04 | EXXONMOBIL3407909427ROCKLAND PAY AT PUMP3407909427 PAY AT PUMP3407909427 ROC NUMBER        07U3504 | | MA 01/05/04 | | 23.86 |
| 01/07/04 | EXXONMOBIL5907783871EAST TAU IN-STORE      5907783871 IN-STORE      5907783871 ROC NUMBER        WY81653 | | MA 01/06/04 | | 1.67 |
| 01/08/04 | H & M STATIONS CORP HOLBROOK 000985900 SERVICE STATION SERVICE STATION ROC NUMBER        529945 | | MA 01/07/04 | 00000985900 | 22.75 |
| 01/10/04 | H & M STATIONS CORP HOLBROOK 000881297 SERVICE STATION SERVICE STATION ROC NUMBER        588198 | | MA 01/09/04 | 00000881297 | 22.15 |
| 01/12/04 | SUNOCO       0663548601RANDOLPH SUNOCO       0010709    001209019 0010709     001209019 ROC NUMBER FUEL/MISC | | MA 01/11/04 | | 9.00 |

Continued on Page 3

✦ Please fold on the perforation below, detach and return with your payment ✦

**Payment Coupon**

Account Number
3794-781209-61009

**Please Pay By
02/15/04** Payable upon receipt in U.S. Dollars.

Please enter account number on all checks and correspondence.

JOHN W GACHAGO
BRISTOL-MYERS SQUIBB
21 LINDEN PARK DR
RANDOLPH        MA    02368-4703

**Total Amount Due
$1,755.27** Checks or drafts must be drawn against banks located in the U.S.

Check here if address, telephone number, or e-mail address has changed. Note changes on reverse side.

Mail Payment to:      AMERICAN EXPRESS
P.O. BOX 1270
NEWARK NJ 07101-1270

000037947812096100 9000175527000080088 30AA



| DOCUMENT: TE – Travel Card Administration – External Procedure | EFFECTIVE DATE: 10/15/2003 | REVISION# REVISION DATE: |
|---|---|---|
| SUBJECT: Auditing of Expense Reports & Card Accounts | | PAGE: 1 |

It is the employee's responsibility to audit their own reports and submit outstanding business charges.

The Travel Card Administrator will audit only T&E's and American Express statements for active employee's with credits, suspected abuse, or terminated employee's accounts. If the audit concludes there is abuse on the corporate card, your manager will be notified and the account suspended. Human Resources will be notified depending upon the extent of the abuse.

Below are tips on auditing American Express Accounts & T&E's:

Requests for T&E summaries and AMEX statements can be made to the Travel Card Administrator: MG-GBS-CORPORATE_CARD_ADMINISTRATION@bms.com

Employees can also access their accounts on-line with American Express. To sign up for this service go to https://home3.americanexpress.com/cards/registered.asp

- ✓ Match the AMEX statements with the T&E summaries, line for line, to determine what charges have not been accounted for.

- ✓ Verify that charges are valid. Contact AMEX at 800/528-2122 or on-line within 60 days if you are disputing the charge. AMEX will post a temporary credit until the charge is resolved. If you dispute the charge after 60 days, you will need to pay for the charge while AMEX is investigating it.

- ✓ Have cash advances been expensed? Have the cash advance fees been expensed. The fees do not show up in card data. Employee should check their AMEX statements for the fee amount.

- ✓ Are there any delinquency fees? If so, the employee is responsible for payment. AMEX will only remove delinquency fees if they have misposted a payment. AMEX will no longer remove delinquency fees for lost statements as the employee has the ability to check their accounts on-line.

  Note: Delinquency fees are not reimbursable through the T&E system

- ✓ If you returned tickets to the travel agency check to make sure they been credited. Remember that non-refundable tickets cannot be credited and should be expensed even if they are not used.

- ✓ Have you purchased airline tickets in advance or have you prepaid a conference fee? If so, you are able to submit these charges prior to attending your meeting or conference.

1


**ne**
**BMS**

| DOCUMENT:<br>TE – Travel Card Administration<br>– External Procedure | EFFECTIVE DATE:<br>10/15/2003 | REVISION#<br><br>REVISION DATE: |
| SUBJECT:<br>Auditing of Expense Reports & Card Accounts | | PAGE: 2 |

✓ Have you expensed your AT&T calling card charges?

✓ Did you sign up for the AMEX Membership Rewards Program? If so, the $75 fee is not reimbursable through BMS and does not appear in card data. The employee must pay this fee to AMEX.

✓ Are all of the T&E's that you submitted been approved by your manager and paid to your AMEX account? To check on the status of your T&E reports, please refer to the T&E Policy located at: http://onefss.bms.com/depts/express_te/index.html , Policies/Procedures, External, Policies, File Category: Travel & Entertainment, Checking Status of Expense Report.

✓ Did you mark a charge as non-reimbursable instead of reimbursable? If so, you will need to resubmit the charge as reimbursable.

✓ Did you apply a credit from a vendor to a T&E, but did not apply the original charge to a T&E? If so, you will need to apply the original charge.

Once you have reviewed your AMEX statements and T&E summaries and found the missing charge (s), submit them on an expense report. If you have older charges that have not been expensed, use the current date and note on the report the original date.

Check request payments to pay charge card accounts for active BMS employees is not acceptable and against company policy.

**Main Identity**

| From: | "Cathleen A Everk" <cathleen.everk@bms.com> |
|---|---|
| To: | "John Gachago" <jgachago84@comcast.net> |
| Cc: | <joeseph.deluca@bms.com>; <elaine.farinacci@bms.com>; <dinorah.william@bms.com> |
| Sent: | Friday, September 03, 2004 8:55 AM |
| Attach: | cathleen.everk.vcf |
| Subject: | Re: American Express Card# 3794-781209-61009-Former Employee J Gachago |

I have contacted American Express to let them know of the situation. Unfortunately I have no con r as to whether your current card can be use. I do not have that kind of authority.

In the future, you will contact either Dinorah Williams or myself in writing. Joe Deluca should no contacted.

Cathy

John Gachago wrote:

> Cathy
>
> I am finally in receipt of your email regarding this Amex situation. Once I view the information you're sending I will figure out what needs to be done. In the meantime I would appreciate it if you called Amex and made them aware that we are in the process of resolving this matter and hence the need to take a hold off my current Amex card. As you can well imagine my current business reponsibilities are being adversley affected because of this hold.
>
> I had left 2 messages for Joe Deluca on this matter but failed to hear back from him.
>
> Once again yesterday I got a message from a Sandy at American Express saying they haven't heard from BMS. Her number is 866 505 6811. Despite the outrageous amount of time it may take I dont have a problem reconciling my statements if the hold on my current card is eliminated.
>
> Kindly advise on this so I can proceed with the necessary action. As metioned previously when I left BMS I felt I did so with a very clean slate, including a final expense report. Needless to say it seems like we have a discrepancy that needs to be resolved. In my mind this ought to have been evident prior to my resignation from BMS. I have spoken to Dinorah Williams 609 897 4605 who mentioned she would be in touch with you.
>
> I can be reached on 781 724 6254.
>
> Regards
>
> John Gachago

John

I heard back from Joe Deluca and you will need to reconcile your account. He stated that your final report was paid and that it will be your responsibility to file an expense report with those charges you had not expensed.

I will be sending your AMEX statements and T&E's. You will need to determine what charges have not been accounted for and then fill out the hard copy report that I will also

send. You can send it to me and I will forward it to Joe for approval.

You will receive the package tomorrow at your home.

Cathy

Mapleleaf-Rx Team wrote:

> Dear Cathleen
>
> Two days ago I got back from vacation only to find a message from American
> Express claiming I have an outstanding balance on the BMS corporate card.
>
> I left BMS on May 3rd 2004 and as part or my checkout process I completed a final
> expense report. The same was submitted to my former DBM Joe Deluca whose
> number is 401 725 0550 @ 27 Hyde Ave, Pawtucket, RI.
>
> The final expense report would have accounted for all my BMS expenses.
> Consequently there should be a zero balance.
> Kindly address this issue with Sandy at American Express 866 505 6811 as they seem
> to feel that I am responsible for BMS expenses. They have also put a hold on my
> Amex corp card with my current employer until this matter is resolved. From what I
> was made to understand by this Sandy person the BMS card was a limited liability
> account in that I was resposible for it. At no time did BMS make me aware that this
> corporate card was going to be my personal responsibility.
>
> I may be reached on hme 781 961 9384 or mobile 781 724 6254 to confirm that this
> issue is resolved. Thank you for giving this your immediate attention.
>
> Regards
>
> John Gachago
> 21 Linden Park Dr
> Randolph, MA 02368

3/31/2005



To:
American Express Collection Dept (fax 402 384 5044 )
America Express Legal Counsel
PO Box 6618
Omaha, NE 68105-0618.

**Subject: John Gachago vs Bristol Myers Squibb and American Express Case#
04CV2682 –Quincy District Court  and Harassment by American Express
Collection Dept**

This is a formal request that you cease and desist from harassing me about the debt owed
to you by Bristol Myers Squibb.

Your collection department has called to harass me on several occasions about this debt
insisting that it is mine and that I should pay for it. The first time an individual by the
name Tracy called on March 10th 2005 I explained to her it was under litigation and gave
her the docket number yet the same collector and collection department continues to call
and harass me and my family about a matter that is under litigation.

They have called me on the following days with the same harassing request:

03/12/05 – 10.26am
03/17/05 – 3.22 am
03/21/05 – 2.11 pm
03/26/05 – 9.33am

Please be advised that this is my final notice to you and this is a matter I will bring to the
attention of the court. It is bad enough that this has had a profoundly negative impact on
my credit that has prevented us from securing a mortgage with 3 lenders already.

Regards,

John Gachago

CC: Eve Slattery for Bristol Myers Squibb (by certified mail)
Faxed and Mailed via certified mail on 3/31/05.